IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KOVACHERICK J. ARNOLD,

    Plaintiff,

vs.                                     Case No. 4:10cv204-WS/WCS

FLORIDA DEPARTMENT
OF CORRECTIONS,

    Defendants.

_____/

## REPORT AND RECOMMENDATION

District Judge Stafford referred Plaintiff's *pro se* motion to reopen the case (vacate the judgment), doc. 56, for a hearing and a report and recommendation. Doc. 56. Plaintiff's former attorney, Gary Printy, was permitted to withdraw. Doc. 61. The hearing was held on September 23, 2011. Doc. 66. Marie Mattox entered an appearance on behalf of Plaintiff at the hearing. A transcript of the hearing has been filed. Doc. 67. The parties have filed memoranda. Docs. 69 and 73.

**Findings of fact**

On about April 25, 2011, Plaintiff had a pain in his chest. Doc. 67, p. 4; doc. 56, pp. 12 and 17 on ECF. He had had three prior heart attacks. Doc. 67, p. 4. He went

to the emergency room and was admitted.  *Id.*  He was taken into surgery that morning and had cardiac catheterization on April 25, 2011.  *Id.*, p. 5.  He had previously had stents placed in his cardiac arteries, and the catheterization procedure was to check on the stents, look for blockage, and replace stents if necessary.  *Id.*, pp. 5-6.

Plaintiff was given Percocet,[1] 325 mg, to take as needed for pain.  Doc. 56, p. 7 on ECF.  He was also given promethazine hydrochloride tablets (Phenergan).[2]  *Id.*, p. 4.  Plaintiff testified that while at the hospital, he had a patch on his chest for the release of pain medication as needed.  Doc. 67, p. 8.

Plaintiff was discharged at about 3:30 p.m. on April 26, 2011.  Doc. 56, p. 12.  Plaintiff was told to follow the post cardiac catheterization discharge instructions.  Doc. 62, p. 6.  Those instructions advised that the medication he had received that day might cause dizziness, drowsiness, or loss of balance.  *Id.*, p. 3.  He was advised not to make any "important decisions" that day (April 26, 2011) "such as financial or legal."  *Id.*  He was advised to have "someone stay with you for the next 24 hours."  *Id.*  He was not to drive or operate hazardous machinery for 48 hours.  *Id.*  He could use an automatic transmission after 48 hours.  *Id.*

Plaintiff testified that on the morning of April 26th, the day he was discharged from the hospital, he told his attorney, Gary Printy, that he had had a cardiac

---

[1] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.   Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx.

[2] Phenergan is an antihistamine and is also used for motion sickness and nausea after surgery.  See http://www.drugs.com/phenergan.html.

Case No. 4:10cv204-WS/WCS

catheterization procedure the day before. Doc. 67, p. 16. Plaintiff testified that Mr. Printy told him that the mediation was already scheduled for April 27, 2011, that fees would have to be paid if the mediation was cancelled, and Plaintiff told Mr. Printy that he would "try to make it there the best I could." *Id.*, pp. 6-7.

Mr. Printy drove Plaintiff to the mediation. *Id.*, p. 9. Plaintiff said that he seemed to be okay, "kind of fair," when the mediation began. *Id.*, pp. 7, 9. The mediation lasted all day. *Id.*, pp. 9-10. As the day wore on, Plaintiff began to feel tingling and became uncomfortable and agitated. *Id.* He said that by noon, his arms and legs were in pain, he had numbness, and nausea. *Id.*, p. 10. He said he thought he would have to return to the hospital. *Id.*, p. 23. Plaintiff said that he told Mr. Printy several times that he needed to stop, that he did not know what was occurring, and he needed Mr. Printy to drive him home. *Id.*, pp. 10-11. He said he told Mr. Printy several times, "I'm ready to go." *Id.*, p. 23. Mr. Printy's response was: "Let's wait around a little while longer, see what's going to happen." *Id.*, p. 11. Plaintiff testified that he did not understand what was happening during the last half of mediation. *Id.* Plaintiff said that when he was presented with the mediation settlement document, he thought that they had reached an impasse and that he was going to court. *Id.*, p. 13.

Plaintiff did not testify that he was taking pain medication on the day of the mediation. When asked what medications he was using at the time of mediation, he

said he had taken his "normal, Plavix,[3] Crestor.[4]"  *Id.*, p. 8.  He then mention a morphine patch that was given to him before his was discharged, but I find that he was talking about a morphine patch that was given to him while he was still in the hospital.  *Id.*

Plaintiff did not tell Gary Anton, the mediator, that he was not feeling well enough to continue.  Doc. 67, p. 18.  Mr. Anton testified that Plaintiff appeared to be alert enough during mediation, and that Plaintiff specifically asked that the settlement contain a provision that would change his status with the Florida Department of Law Enforcement.  *Id.*, pp. 33, 35-36.  Mr. Anton said that had he known that Plaintiff had a medical condition, was not feeling well, or had had cardiac catheterization the day before, that would have "raised a red flag" and he would have carefully inquired as to Plaintiff's capacity to engage in mediation.  *Id.*, pp. 27-28.  Mr. Anton said that nothing that Plaintiff did caused him to be concerned.  *Id.*, p. 33.  He said that Plaintiff appeared to him to be frustrated with the offers made in mediation, and "not real happy," but that is normal.  He said that Plaintiff appeared to be "resigned."  *Id.*, p. 33.

It is undisputed that Defendant did nothing to subject Plaintiff to duress or unfair coercion during the mediation, and did not know that Plaintiff had had the cardiac catheterization procedure the day before.

---

[3] Plavix is a blood thinner used to treat people who have recently had a heart attack, stroke, disease of the arteries.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx.

[4] Crestor is in a class of drugs called "statins," which are used to lower cholesterol levels when a low-fat diet has failed to work.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, *supra*.

Plaintiff's demeanor at the hearing was calm and not overtly demonstrative. Had Plaintiff been feeling unwell at my hearing, it would have been hard for me to tell, given his quiet demeanor. Thus, it is credible that the mediator and Defendant did not know that Plaintiff was not feeling well during the latter half of the mediation.

**Legal analysis**

Settlements are governed by the rules for interpretation of contracts. Robbie v. City of Miami, 469 So. 2d 1384, 1385 (Fla. 1985). However, settlements "are highly favored and will be enforced whenever possible." *Id*.

The issue before the court is whether this settlement should be set aside due to duress or due to Plaintiff's incompetence to enter into a contract at the mediation. A contract may be set aside if it was reached under fraud, deceit, duress, coercion, misrepresentation, or overreaching. Casto v. Casto, 508 So.2d 330, 333 (Fla. 1987) (marital agreement). Duress is:

> A condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do and act or make a contract not of his own volition.

T.G. v. Department of Children and Families, 9 So. 3d 48, 48 (Fla. 4th DCA 2009), citing Herald v. Hardin, 95 Fla. 889, 116 So. 863, 864 (1928). In order to prove duress,

> it must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct *of the opposite side.*

*Id.*, quotations and citation omitted, emphasis added.[5]

---

[5] An example of the application of the coercion and duress rule is Crupi v. Crupi, 784 So. 2d 611 (Fla. 5th DCA 2001), relied upon by Defendant. In that domestic relations case, the court found no coercion or duress, holding: "We agree with the trial court's finding that three Xanax pills, and anxiety and pressure to settle are insufficient proof of

Plaintiff has not shown duress as so defined. Defendant did nothing to subject Plaintiff to duress. Defendant was unaware of Plaintiff's medical condition.

A person has sufficient mental capacity to enter into a contract if he or she comprehends the essential elements of the matter to be agreed upon. *Cf.*, Hodges v. Atlantic Nat. Bank of Jacksonville, 134 Fla. 702, 713, 184 So. 875, 879-880 (Fla. 1938), citing 28 C.J., Gifts, Sec. 17, pp. 626 ("The general rule is that, if the donor has sufficient mental capacity to comprehend the transaction, if he understands the extent and value of his property, what persons are the objects of his bounty, and the manner in which he is distributing his property among them, his gift will be valid."); Saliba v. James, 143 Fla. 404, 412, 196 So. 832, 835 (Fla. 1940) (same). "Mere mental weakness will not authorize a court of equity to set aside a deed if it does not amount to inability to comprehend the effect and nature of the transaction and is not accompanied by evidence of imposition or undue influence." Parks v. Harden, 130 So. 2d 626, 628 (Fla. 2d DCA 1961).

Plaintiff did not testify that he had ingested any pain medication that day and he did not testify that he was confused at mediation due to pain medication. Instead, the premise of Plaintiff's motion to vacate the judgment is that he was in such pain and ill health that he could not concentrate and, as a consequence, was legally incompetent to enter into a contract; that he lacked the mental capacity to understand the essential elements of the matter before him.

---

*coercion* necessary to set aside such an agreement. Otherwise, few, if any, mediated settlement agreements would be enforceable." 784 So. 2d at 614 (emphasis added).

While it is plain that Plaintiff was in ill health and should not have been attempting to mediate his case that day, I must conclude that Plaintiff has not shown mental incompetence sufficient to set aside the agreement as defined by Florida law.  The terms of the agreement he signed are rather simple.  Defendant was to pay Plaintiff $10,000,[6] the money was to be held in Mr. Printy's trust account, Mr. Printy was not to disburse the money until a final settlement agreement was executed, Defendant was to give a neutral reference, the record was to be changed to a resignation, and Defendant would notify the Florida Department of Law Enforcement that Plaintiff left by resignation rather than termination.  Doc. 52-1, pp. 1-2.  Plaintiff could have informed the mediator that he was not able to comprehend the process and could have asked to continue the process until he felt better, but, on advice of his lawyer, did not.  Plaintiff has not shown that he lacked mental competence to understand the basic elements of this transaction.

Accordingly, it is **RECOMMENDED** that the court **DENY** Plaintiff's motion to vacate the judgment, doc. 56.

**IN CHAMBERS** at Tallahassee, Florida, on October 21, 2010.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[6] The way in which the $10,000 was to be disbursed is not clear.  Paragraph 1 of the agreement signed by Plaintiff states that Defendant will pay Plaintiff $10,000 by check to the trust account of Mr. Printy.  Doc. 52-1, p. 1.  The draft of the formal settlement states that there is no payment of pay or compensatory damages to Plaintiff, and the entire $10,000 is payable to Mr. Printy as his fee.  *Id.*, pp. 2-3, ¶¶ 2-5.  But that lack of clarity is between Plaintiff and Mr. Printy, not between Plaintiff and Defendant.

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**